**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JIN RE: GLUCAGON-LIKE PEPTIDE-1 RECEPTOR AGONISTS (GLP-1 RAS) NON-ARTERITIC ANTERIOR ISCHEMIC OPTIC NEUROPATHY PRODUCTS LIABILITY LITIGATION | MDL NO. 3163<br><br>THIS DOCUMENT RELATES TO ALL CASES<br><br>JUDGE KAREN SPENCER MARSTON |
| JANE NORTON,<br><br>*Plaintiff*,<br>v.<br><br>NOVO NORDISK INC, AND NOVO NORDISK A/S,<br><br>*Defendants*. | COMPLAINT AND JURY DEMAND<br><br>CIVIL ACTION NO.: _______________ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jane Norton files this Complaint pursuant to the Direct Filing Order (Case Management Order No. 4) entered in MDL No. 3163 and agrees to be bound by the rights, protections, privileges, and obligations of that Direct Filing Order and other Orders of the Court.

Further, in accordance with the Direct Filing Order, Plaintiff hereby designates the United States District Court for the Southern District of New York as Plaintiff's designated Original Venue. Plaintiff makes this selection based upon the following factors (28 U.S.C. § 1391):

[X] Plaintiff currently resides in New York.

[X] Plaintiff purchased and used Defendant(s)' products in New York, New York.

[X] The Original Venue is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, specifically the medical treatment, prescribing

decisions, and failure to warn Plaintiff's prescribing physician, Dr. Emilia Pauline Liao, who practices in New York, New York.

## I. INTRODUCTION

1. This is an action for damages suffered by Plaintiff Jane Norton, who sustained severe and permanent injuries, specifically developing non-arteritic anterior ischemic optic neuropathy (NAION), an irreversible condition that can cause sudden and permanent vision loss, as a direct and proximate result of Plaintiff's use of Defendants' prescription medication, Wegovy.[1]

2. Wegovy (semaglutide) belongs to a class of drugs called GLP-1 RAs, prescribed for chronic weight management.

3. In March 2024, Plaintiff was prescribed Wegovy by her New York-based endocrinologist, Dr. Emilia Pauline Liao. Plaintiff's dose was escalated on the standard titration schedule, reaching 1.0 mg in October 2024.

4. The morning after her first 1.0 mg dose, Plaintiff awoke with sudden, painless, partial vision loss in her right eye, which was formally diagnosed as NAION on November 4, 2024.

5. Despite possessing "newly acquired information" from adverse event reports and scientific literature indicating a severe risk of NAION associated with semaglutide use, Defendants failed to submit a "Changes Being Effected" (CBE) label update to warn physicians and patients in the United States.[2]

---

[1] *See* Cleveland Clinic, *Ischemic Optic Neuropathy*, available at https://my.clevelandclinic.org/health/diseases/ischemic-optic-neuropathy (last visited August 31, 2026).
[2] *See* Hathaway, *et al., Risk of Nonarteritic Anterior Ischemic Optic Neuropathy in Patients Prescribed Semaglutide,* 142 JAMA OPHTHALMOLOGY 732 (2024).

6. Defendants failed to adequately warn Plaintiff's New York-based prescribing physician of the risk of NAION, thereby depriving the physician of the opportunity to adequately screen Plaintiff for anatomical risk factors or alter her prescribing decision.

7. As a direct and proximate result of Defendants' failure to warn, Plaintiff suffered irreversible ischemic damage to her optic nerve resulting in permanent vision loss, causing significant economic damages, loss of earning capacity, pain, suffering, and emotional distress.

## II. PARTIES

8. Plaintiff Jane Norton is a resident and citizen of the State of New York.

9. Defendant Novo Nordisk A/S is and at all relevant times has been a public limited liability company organized under the laws of Denmark with a principal place of business in Bagsværd, Denmark.

10. Defendant Novo Nordisk Inc. is and at all relevant times has been a Delaware corporation with a principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey.

11. Defendants Novo Nordisk Inc. and Novo Nordisk A/S are referred to collectively herein as "Novo Nordisk," or "Novo," or "the Novo Nordisk Defendants."

12. Each of the Novo Nordisk Defendants was the agent and employee of the other Novo Nordisk Defendants and, in doing the things alleged, was acting within the course and scope of such agency and employment and with the other Novo Nordisk Defendants' actual and implied permission, consent, authorization and approval.

13. In collaboration amongst themselves, as part of their business, and at all relevant times, the Novo Nordisk Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed GLP-1 RA drugs, including Ozempic, Rybelsus, Wegovy, Victoza, and Saxenda.

## III. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction under 28 U.S.C. §1332(a) as the matter in controversy exceeds the value of $75,000, exclusive of interest and costs and is between citizens of different states and/or a foreign state, as Plaintiff is a citizen of New York, and each Defendant is neither incorporated nor has its principal place of business in New York.

15. Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in this District. Defendants have caused harm to Plaintiff in this District.

16. This Court has personal jurisdiction over Defendants because they conduct substantial business in New York; and some of the actions giving rise to this action took place in New York and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed in this state in the ordinary course of business, commerce, trade, or use. Defendants, at all relevant times, have conducted and continue to conduct business in New York, and every other state in the country.

## IV. FACTUAL ALLEGATIONS

### A. Introduction To GLP-1 and GLP -1 RA Products, Including Wegovy

17. Glucagon-like peptide-1 ("GLP-1") is a naturally occurring hormone involved in glucose regulation, digestion, appetite, and energy balance. GLP-1 is released in response to food intake and acts through GLP-1 receptors located in multiple tissues, including the pancreas, gastrointestinal tract, cardiovascular system, and brain.[3]

[3] *See* Cleveland Clinic, *GLP-1 Agonists*, available at https://my.clevelandclinic.org/health/treatments/13901-glp-1-agonists (last visited August 31, 2026).

18. In 1983, researchers identified the relevant glucagon-related peptide sequence in the precursor molecule preproglucagon. That discovery led to further research into GLP-1 and its physiological effects.[4]

19. In 1993, researchers cloned and functionally expressed the human GLP-1 receptor, demonstrating the receptor's role in mediating the effects of GLP-1 and providing a foundation for drug development.[5]

20. In 1993, researchers identified and studied exendin-4, a peptide derived from the saliva of the Gila monster that acts at the GLP-1 receptor. Exendin-4 provided a model for developing longer-acting GLP-1 receptor agonists.

21. Byetta (exenatide), the first GLP-1 receptor agonist drug, was approved in 2005. Unlike naturally occurring GLP-1, which has a half-life of only a few minutes, exenatide was designed to act for substantially longer.[6]

22. Novo thereafter developed liraglutide, another GLP-1 receptor agonist. Research showed that liraglutide could markedly suppress food intake in animals, and Novo later marketed liraglutide as Victoza and Saxenda.[7]

23. The GLP-1 RA class includes semaglutide, liraglutide, tirzepatide, dulaglutide, exenatide, albiglutide, and lixisenatide. Novo markets semaglutide as Wegovy.

---

[4] *See* Bell, *et al., Hamster preproglucagon contains the sequence of glucagon and two related peptides*, 302 NATURE 716 (1983).

[5] *See* Thorens, *et al., Cloning and functional expression of the human islet glp-1 receptor*, 42 DIABETES 1678 (1993).

[6] *See* News Release: Amylin and Lilly Announce FDA Approval of BYETTA(TM) (Exenatide Injection) (Apr. 29, 2005), available at https://investor.lilly.com/news-releases/news-release-details/amylin-and-lilly-announce-fda-approval-byettatm-exenatide (last visited August 31, 2026).

[7] *See* Kolata, G., *We Know Where New Weight Loss Drugs Came From, but Not Why They Work*, NY TIMES (Aug. 17, 2023), available at https://www.nytimes.com/2023/08/17/health/weight-loss-drugs-obesity-ozempic-wegovy.html. (last visited August 31, 2026).

24. The FDA recognizes GLP-1 RAs as a class based on similarities in their mechanisms of action, physiological effects, and chemical structures including liraglutide, dulaglutide, and semaglutide.[8] Defendants likewise recognize that semaglutide and other GLP-1 RAs share class characteristics.

25. GLP-1 RAs mimic the activity of endogenous GLP-1 by binding to and activating GLP-1 receptors.[9] The drugs thereby produce effects that influence insulin secretion, glucagon secretion, gastric emptying, appetite, and food intake.[10]

26. When blood glucose is elevated, GLP-1 receptor activation stimulates pancreatic insulin secretion and suppresses glucagon secretion. These effects lower blood glucose and alter the body's metabolic response to food.[11]

27. GLP-1 receptor activation also slows gastric emptying and acts on the central nervous system to reduce hunger and food intake.[12] These effects contribute to the weight loss marketed by Defendants.[13]

28. Novo developed semaglutide as a chemically modified GLP-1 analogue designed to resist rapid degradation and remain active for approximately one week. Its long half-life permits once-weekly subcutaneous administration.

---

8 *See* U.S. FOOD AND DRUG ADMIN., *FDA Ozempic Summary Review*, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/209637Orig1s000SumR.pdf (last visited August 31, 2026).

9 *See* Cleveland Clinic, supra note 2.

10 *See* Bloemendaal, *et al.*, *Effects of glucagon-like peptide 1 on appetite and body weight: focus on the CNS*, J. ENDOCRINOLOGY (Apr. 2014).

11 *See* Cleveland Clinic, supra note 2.

12 *See* Deane, *et al., Endogenous Glucagon-Like Peptide-1 Slows Gastric Emptying in Healthy Subjects, Attenuating Postprandial Glycemia*, 95 J. CLINICAL ENDOCRINOLOGY AND METABOLISM 225 (2010).

13 *See* Bloemendaal, *et al.*, supra note 10.

29. Wegovy is Novo's branded semaglutide injection approved for chronic weight management. Wegovy is administered by subcutaneous injection and is escalated over time according to a titration schedule.

30. Wegovy's maximum recommended maintenance dose is 2.4 mg administered once weekly. The dose-escalation schedule is intended to improve tolerability but does not eliminate the risks associated with semaglutide exposure.

31. Wegovy's pharmacological effects are not limited to weight reduction. Because GLP-1 receptors and related physiological pathways affect multiple organs and systems, adverse effects may occur outside the gastrointestinal and metabolic systems. It has been known since at least 2016 that the human eye contains GLP-1 receptors, a finding confirmed by Novo's own scientists.[14]

32. The semaglutide products marketed by Novo are substantially similar in active ingredient and mechanism. Evidence concerning adverse events associated with semaglutide or GLP-1 RAs is therefore relevant to Wegovy's safety profile.

## B. GLP-1 RAs are Ineffective in Many Patients Because of High Discontinuation Rates, Minimal to No Weight Loss for a Significant Percentage of Patients, and Subsequent Rebound Weight Gain

33. Many patients discontinue GLP-1 RA therapy before receiving the benefits represented in Defendants' marketing. Discontinuation may result from adverse effects, cost, limited insurance coverage, drug shortages, or the failure to achieve the expected weight loss.

34. A May 2024 Blue Cross Blue Shield analysis of nearly 170,000 GLP-1 RA users found that approximately 30 percent discontinued treatment within four weeks and approximately

[14] *See* Hernández, C., *et al., Topical Administration of GLP-1 Receptor Agonists Prevents Retinal Neurodegeneration in Experimental Diabetes*, 65(1) DIABETES 172–87 (2016); *see also* Hebsgaard, J. B., *et al., Glucagon-like peptide-1 receptor expression in the human eye*, 20(9) DIABETES OBES. METAB. 2304–2308 (2018).

58 percent discontinued within 180 days.[15] Patients who discontinue shortly after starting treatment are unlikely to achieve the claimed health benefits.

35. A June 2024 real-world study of 4,066 insured GLP-1 RA weight-loss patients found that only approximately one in three patients remained on treatment after one year, which is substantially lower than clinical-trial persistence. The study concluded that high discontinuation rates create GLP-1 obesity-treatment effectiveness concerns because treatment value is unlikely to be realized if therapy is discontinued during the first year and weight loss is not achieved or maintained.[16]

36. Studies funded by or involving Novo have acknowledged that semaglutide-associated weight loss may plateau between weeks 60 and 68 and that patients who discontinue semaglutide gradually regain weight.[17]

37. A study of semaglutide withdrawal concluded that stopping once-weekly semaglutide "led to most of the weight loss being regained within 1 year," reinforcing the need for continued treatment to maintain weight loss.[18]

38. A systematic review and network meta-analysis reported that the effects of GLP-1 RAs on body weight gradually decline during long-term use, indicating potential limitations for sustained long-term weight loss efforts.[19]

---

[15] *See* BLUE HEALTH INTELLIGENCE, *Real-World Trends in GLP-1 Treatment Persistence and Prescribing For Weight Management* (May 2024), available at https://www.bcbs.com/media/pdf/BHI_Issue_Brief_GLP1_Trends.pdf (last visited August 31, 2026).

[16] *See* Gleason, *et al., Real-world persistence and adherence to glucagon-like peptide-1 receptor agonists among obese commercially insured adults without diabetes*, 30 JMCP 2 (June 2024).

[17] *See* Rubino, *et al., Effect of Continued Weekly Subcutaneous Semaglutide vs Placebo on Weight Loss Maintenance in Adults with Overweight or Obesity: The STEP 4 Randomized Clinical Trial*, JAMA (Mar. 2021).

[18] Wilding, *et al., Weight regain and cardiometabolic effects after withdrawal of semaglutide: The STEP 1 trial extension*, 24 DIABETES OBES. METAB. 1553, 1562 (Feb. 2022).

[19] *See* Yao, *et al., Comparative effectiveness of GLP-1 receptor agonists on glycaemic control, body weight, and lipid profile for type 2 diabetes: systematic review and network meta-analysis*, BMJ (Jan. 2024).

39. Studies also indicate that average weight loss with semaglutide is only approximately 10.09 percent of body weight.[20] Research further indicates that approximately 14 percent of patients lose less than five percent of their body weight and one-third lose less than ten percent.[21] Defendants' promotional materials did not fairly communicate the likelihood of minimal or no meaningful weight loss for a substantial group of patients.

40. Patients who regain weight after stopping a GLP-1 RA may regain a greater proportion of fat relative to muscle.[22] Defendants nevertheless emphasized weight as the principal measure of health and did not adequately explain the limitations of that measure.[23]

41. Safe and effective alternatives for weight management exist, including lifestyle-based care, bariatric procedures for appropriate patients, and other approved medicines. The availability of alternatives is relevant to the risk-utility analysis and to the adequacy of Defendants' warnings.

**C. The Regulatory History of Wegovy**

42. On December 4, 2020, Novo submitted New Drug Application (NDA) 215256 for Wegovy, a semaglutide 2.4 mg injection, for chronic weight management.

---

[20] *See* Gao, *et al., Efficacy and safety of semaglutide on weight loss in obese or overweight patients without diabetes: A systematic review and meta-analysis of randomized controlled trials, FRONTIERS IN PHARMACOLOGY 1 (2022).*

[21] *See* Carbajal, E., *Up to 15% of patients on weight loss drugs may be "non-responders,"* BECKER'S HOSPITAL REVIEW (Apr. 1, 2024), available at https://www.beckershospitalreview.com/glp-1s/up-to-15-of-patients-on-weight-loss-drugs-non-responders.html (last visited August 31, 2026).

[22] *See* Sullivan, K., *Weight loss drugs can lead to muscle loss, too. Is that a bad thing?*, NBC NEWS (May 20, 2023), available at https://www.nbcnews.com/health/health-news/weight-loss-drugs-muscle-loss-rcna84936.

[23] *See* Margo, J., *The alarming twist when using Ozempic for weight loss*, FINANCIAL REVIEW (July 21, 2023), available at https://www.afr.com/policy/health-and-education/lighter-but-fatter-the-ozempic-paradox-20230718-p5dp5w (last visited August 31, 2026).

43. On June 4, 2021, the FDA approved Wegovy for chronic weight management in adults with obesity or overweight with at least one weight-related condition, in conjunction with a reduced-calorie diet and increased physical activity.[24]

44. On March 8, 2024, the FDA approved a supplemental indication for Wegovy to reduce the risk of cardiovascular death, heart attack, and stroke in certain adults with cardiovascular disease and overweight or obesity.[25]

45. At all times relevant to Plaintiff's use of Wegovy, no version of the Wegovy prescribing information warned patients or physicians that Wegovy or semaglutide may cause NAION. The label also did not provide adequate information concerning screening, monitoring, or dose-related precautions for that risk.

46. The absence of a warning was not required by the FDA's approval of Wegovy. Defendants remained responsible for evaluating post-approval safety information and for providing an adequate warning when reasonable evidence of a serious hazard emerged.

## D. Defendants Were on Notice that GLP-1 RAS are Associated with NAION

47. NAION is an ischemic injury to the optic nerve head caused by insufficient blood flow. It typically presents with sudden, painless vision loss and can result in permanent impairment.[26]

[24] *See* FDA APPROVAL LETTER FOR NDA 215256 (June 4, 2021), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2021/215256Orig1s000ltr.pdf (last visited August 31, 2026).

[25] *See* FDA SUPPLEMENTAL APPROVAL FOR NDA 215256/S-011 (Mar. 8, 2024), available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/215256Orig1s011ltr.pdf (last visited August 31, 2026).

[26] *See* Cleveland Clinic, supra note 1.

48. NAION can occur when the optic nerve is vulnerable to impaired perfusion. The condition may be associated with anatomical, vascular, metabolic, and medication-related factors, and it can cause irreversible damage even when diagnosed promptly. Vision loss associated with NAION is generally untreatable and may result in permanent blindness; about 15 percent of patients who have NAION in one eye eventually develop it in the other eye.

49. Before and during the period in which Wegovy was prescribed and used, scientific literature and adverse-event information reported an association between GLP-1 RAs and optic-nerve ischemic events, including NAION.

50. On July 3, 2024, a study evaluated patients prescribed semaglutide using real-world data from December 2017 through November 2023. The cumulative incidence of NAION was 8.9% among type 2 diabetes patients taking semaglutide, compared with 1.8% among patients not taking GLP-1 RA medications, with a hazard ratio of 4.28. Among overweight or obese patients, the cumulative incidence was 6.7% for patients taking semaglutide, compared with 0.8% for those not taking GLP-1 RA medications, with a hazard ratio of 7.64. The study concerned semaglutide used for both diabetes and weight management.[27]

51. The study identified the association before and during Plaintiff's use of Wegovy and provided reasonable evidence of a clinically significant and serious potential hazard.[28] It proposed a potential causal mechanism: "expression of the GLP-1 receptor in the human optic nerve and GLP-1 RA induced enhanced sympathetic nervous system activity might influence optic nerve head perfusion and potentially increase the risk of NAION."[29]

[27] *See* Hathaway, *et al.*, supra note 2.
[28] *Id.*
[29] *Id.*

52. The FDA Adverse Event Reporting System (FAERS) contained multiple reports of "Optic Ischaemic Neuropathy" in connection with GLP-1 RAs. FAERS does not contain a code for NAION itself; it uses "optic ischemic neuropathy," a condition that encompasses NAION. The earliest reported Optic Ischaemic Neuropathy event associated with any GLP-1 RA occurred in 2012, and the earliest associated with semaglutide specifically occurred in 2019.[30]

53. The adverse-event reports were consistent with a safety signal because the events were serious, medically recognizable, and temporally associated with GLP-1 RA exposure. Pharmacovigilance analyses found increased reporting rates.[31] These analyses warranted investigation even if they did not, standing alone, establish definitive causation.

54. Fourteen cases of NAION suspected to be causally associated with GLP-1 RA drugs have been reported in published, peer-reviewed case reports, including one in which NAION worsened when the patient was re-challenged after restarting a GLP-1 RA.[32]

55. Danish and Danish-Norwegian cohort studies also examined semaglutide and NAION. A Danish cohort of 424,152 persons with type 2 diabetes reported that once-weekly

---

[30] *See* Castellana, E., *Potential risk of non-arteritic anterior ischaemic optic neuropathy in semaglutide users: pharmacovigilance insights*, EUR. J. HOSP. PHARM. (2024).

[31] *See* Kim, *et al*., *Adverse drug reaction patterns of GLP-1 receptor agonists approved for obesity treatment: Disproportionality analysis from global pharmacovigilance database*, DIABETES OBES. METAB. (2025) (finding an 80% increased risk of reporting vision loss compared with other weight-loss drugs); Massey, *et al., Increased vision impairment reports linked to semaglutide: analysis of FDA adverse event data*, BMC MEDICINE (2025) (finding increased reporting rates of vision impairment for semaglutide ranging from 57% to 289% compared with various weight-loss and diabetes drugs); Azab, *et al., Semaglutide: Nonarteritic Anterior Ischemic Optic Neuropathy in the FDA adverse event reporting system*, OBESITY RESEARCH & CLINICAL PRACTICE (2025) (finding an increased risk of reporting optic ischaemic neuropathy of over 1000%); Procacci, *et al., Disproportionality analysis on semaglutide and nonarteritic anterior ischemic optic neuropathy in the FDA adverse event reporting system: An emerging pharmacovigilance signal?*, OBESITY RESEARCH & CLINICAL PRACTICE (2025) (finding an increased risk of reporting optic ischaemic neuropathy of over 1000%).

[32] *See* Maceroni, *et al., Non arteritic ischemic optic neuropathy in a patient taking semaglutide: Is there a relation? A case report and a review of the literature*, EUROPEAN JOURNAL OF OPHTHALMOLOGY (2025) (one case); Ahmadi, *et al., Anterior ischemic optic neuropathy in patients treated with semaglutide: report of four cases with a possible association*, BMC OPHTHALMOLOGY (2025) (four cases); Katz, *et al., Ophthalmic Complications Associated With the Antidiabetic Drugs Semaglutide and Tirzepatide*, JAMA OPHTHALMOLOGY (2025) (nine cases).

semaglutide "more than doubles the risk of NAION."[33] A Danish–Norwegian cohort study likewise reported that semaglutide users were almost twice as likely to develop NAION as patients taking sodium-glucose cotransporter 2 inhibitors.[34]

56. Subsequent studies further supported the association. One study found increased NAION risk among patients with a history of Ozempic (semaglutide) use or a stand-alone Ozempic prescription history, particularly after multiple years of GLP-1 RA use.[35] Another study likewise found increased risk using a self-controlled case series.[36] A meta-analysis of GLP-1 RA clinical trials reported an overall rate of optic ischemic neuropathy of 5.6 cases per 100,000 patient-years in the treatment group versus 3.0 in the control group, although the authors described the increase as non-statistically significant and noted that rare events may be underreported.[37]

57. The temporal relationship between GLP-1 RA exposure and reported NAION events, together with the class-wide evidence, provided additional support for a causal association. Defendants possessed the expertise and data necessary to evaluate that relationship.

58. Defendants were on notice of the potential association no later than the publication of the July 2024 JAMA Ophthalmology study and the accumulation of adverse-event reports, and they were on notice of the need to investigate and warn before that time.[38] In response to the studies, the Danish Medicines Agency requested that the European Pharmacovigilance Risk

---

[33] Grauslund, J., *et al., Once-weekly semaglutide doubles the five-year risk of nonarteritic anterior ischemic optic neuropathy in a Danish cohort of 424,152 persons with type 2 diabetes*, 10 INT. J. RETINA AND VITREOUS 97 (2024), available at https://journalretinavitreous.biomedcentral.com/articles/10.1186/s40942-024-00620-x (last visited August 31, 2026).
[34] *See* Simonsen, *et al., Use of semaglutide and risk of non-arteritic anterior ischemic optic neuropathy: A Danish–Norwegian cohort study*, DIABETES OBES. METAB. (2025) (online ahead of print).
[35] *See* Hsu, *et al., Semaglutide and Nonarteritic Anterior Ischemic Optic Neuropathy Risk Among Patients With Diabetes*, JAMA OPHTHALMOLOGY (2025).
[36] *See* Cai, et *al., Semaglutide and Nonarteritic Anterior Ischemic Optic Neuropathy*, JAMA OPHTHALMOLOGY (2025).
[37] *See* Silverii, *et al., Glucagon-like peptide 1 (GLP1) receptor agonists and risk for ischemic optic neuropathy: A meta-analysis of randomised controlled trials*, 27 DIABETES OBES. METAB. 1005 (2025).
[38] *See* Hathaway, *et al*., supra note 2.

Assessment Committee (PRAC) further investigate the link between Ozempic and NAION.[39] A Novo spokesperson also acknowledged that cases of NAION, which leads to severe and irreversible vision loss, had been identified in Novo's clinical trials.[40]

59. Despite that notice, Defendants did not add NAION to the Wegovy label, did not provide a targeted warning to prescribing physicians, and did not adequately communicate the risk to patients.

## E. Background on Pharmaceutical Marketing

60. Under the Federal Food, Drug, and Cosmetic Act and FDA regulations, prescription-drug labeling and advertising must be truthful and non-misleading, must fairly present efficacy and risk information, and must disclose material facts about the promoted product. The FD&C Act defines "labeling" as all labels and other written, printed, or graphic matter upon an article or its containers or wrappers, or accompanying the article.[41] Promotional labeling includes written or other matter descriptive of a drug disseminated by or on behalf of its manufacturer.[42]

61. Branded marketing directly identifies a prescription drug and is subject to FDA requirements concerning truthfulness, fair balance, and disclosure of material risks. The FDA's distinction between direct-to-consumer advertisements and promotional labeling, including brochures, booklets, and pamphlets distributed to patients or caregivers, is reflected in FDA

---

[39] *See* DANISH MEDICINES AGENCY, *Suspicion of rare eye condition from Ozempic use to be investigated further* (Dec. 16, 2024), available at https://laegemiddelstyrelsen.dk/en/news/2024/suspicion-of-rare-eye-condition-from-ozempic-use-to-be-investigated-further/ (last visited August 31, 2026).

[40] *See* Dunleavey, K., *After studies flag possible link between Novo's Ozempic and rare eye disorder, Danish agency calls for probe*, FIERCE PHARMA (Dec. 17, 2024), available at https://www.fiercepharma.com/pharma/novo-nordisk-faces-new-reports-suggesting-link-between-ozempic-and-blindness (last visited August 31, 2026).

[41] 21 U.S.C. § 321(m).

[42] See 21 C.F.R. § 202.1(k)(2).

regulations and guidance.[43] The presentation and prominence of risk information are relevant to whether the communication is misleading.

62. Unbranded marketing commonly uses disease-awareness or help-seeking materials that discuss a condition without naming a specific drug. Pharmaceutical companies use unbranded and branded campaigns together to influence patients and physicians while avoiding a complete presentation of product-specific risks.

63. It is lawful for a physician to prescribe an FDA-approved drug for an off-label use, but a manufacturer may not promote a drug for an unapproved use. Off-label promotion can expose patients to adverse effects from a use that has not received the same safety and efficacy review as an approved indication.[44]

64. Pharmaceutical marketing commonly uses sales representatives, direct-to-consumer advertising, advocacy groups, key opinion leaders, social media, websites, telehealth partnerships, television, print, radio, and coupon programs.

65. Novo uses an omnichannel marketing strategy that collects and combines data from multiple promotional channels. Novo then uses analytics, algorithms, and machine learning to target healthcare providers and potential patients with coordinated messages intended to maximize prescriptions. Novo's use of predictive mathematical formulas to select which marketing material should be delivered through which channel and at what time was described in a presentation.[45]

---

[43] *See* U.S. FOOD AND DRUG ADMIN., DRUG ADVERTISING: A GLOSSARY OF TERMS (Jan. 19, 2020), available at https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms (last visited August 31, 2026).

[44] *See* Van Norman, G. A., *Off-Label Use vs Off-Label Marketing: Part 2: Off-Label Marketing—Consequences for Patients, Clinicians, and Researchers*, 8 JACC BASIC TRANSL SCI. 359–370 (2023).

[45] *See* Hyperright AB, *Utilizing Advanced Marketing Analytics for Sales Optimization – Peter Vester, Novo Nordisk*, YOUTUBE (Dec. 22, 2022), available at https://www.youtube.com/watch?v=nCZR6wK7MlU (last visited August 31, 2026).

**F. Defendants' Marketing Strategy**

66. Before the widespread adoption of GLP-1 RA weight-management drugs, diet, exercise, sleep, behavioral interventions, and, for some patients, bariatric surgery were commonly viewed as the principal approaches to weight management. Pharmaceutical treatment was not routinely presented as necessary for most people.

67. In 2013, the American Medical Association recognized obesity as a disease state requiring treatment and prevention. Novo supported organizations and initiatives that helped shift public and medical opinion toward pharmaceutical treatment of obesity.

68. Novo began reorienting its business around obesity and weight-management products and publicly identified establishing a presence in obesity as a strategic focus. Novo thereafter pursued a long-term plan to expand the market for its GLP-1 RA products.

69. Novo's strategy included advocating that obesity be treated as a serious chronic disease and positioning GLP-1 RAs as an essential pharmaceutical intervention. The strategy expanded demand beyond patients for whom a physician had independently determined that the benefits outweighed the risks.

70. Novo understood the financial potential of the United States weight-management market and intentionally targeted the American population through coordinated campaigns directed at physicians, patients, insurers, policymakers, and the media.

71. Novo's efforts helped make Wegovy and other semaglutide products prominent in popular culture and increased demand for prescriptions. Advertising Age declared Ozempic "2023's buzziest drug" and one of the "Hottest Brands, disrupting U.S. culture and industry" on July 10, 2023. The Ozempic coverage and related advertising were part of Novo's broader GLP-1

RA marketing strategy, including Wegovy-specific campaigns, which Novo pursued even while minimizing material limitations and safety risks associated with semaglutide.[46]

72. Novo created and supported unbranded campaigns including "It's Bigger Than Me," "Rethinking Obesity," and "Truth About Weight." These campaigns presented obesity as a chronic health condition and encouraged consumers to seek pharmaceutical treatment.

73. The campaign websites used quizzes, questionnaires, email registrations, and other consumer interactions to gather information about users. Upon information and belief, Novo used that information in its broader analytics and targeting strategy.

74. Novo's public messaging conveyed that diet and exercise alone may be insufficient and that long-term health required medical intervention. The messaging did not fairly explain that many patients discontinue treatment, regain weight, or may experience serious adverse events.

75. Novo also promoted the idea that weight reduction itself established improved health, despite evidence that patients may lose muscle mass, regain fat, and experience no corresponding improvement in overall health.

**G. Defendants' Manipulation of the Medical Community**

76. Novo used a multipronged approach to influence the medical community, including direct payments to physicians, funding of research and articles, conference presentations, advocacy organizations, continuing medical education, and lobbying for broader insurance coverage.

77. Payments from a pharmaceutical company can influence prescribing behavior. Novo made substantial payments to physicians for consulting, meals, travel, speaking, research, and other activities associated with its products.

---

[46] *See* Bushak, L., *Spending on Ozempic, Wegovy and other "diabesity" drugs surge*, MEDICAL MARKETING AND MEDIA (Sept. 29, 2023), available at https://www.mmm-online.com/home/channel/spending-on-ozempic-wegovy-surges/ (last visited August 31, 2026).

78. Between 2018 and 2023, Novo made approximately $153 million in general payments to doctors, and in 2022 alone Novo purchased more than 450,000 meals for doctors. The payments included activities relating to marketing and promotion.[47]

79. At least 57 physicians in the United States each accepted at least $100,000 from Novo in payments associated solely with Wegovy or Saxenda. Many were obesity specialists, academic physicians, authors of treatment guidelines, or leaders of medical societies.[48]

80. Novo used key opinion leaders to promote the safety and efficacy of GLP-1 RAs. Such physicians carried influence with prescribers and patients, while their financial relationships with Novo were not always fully disclosed.

81. Novo directly or indirectly funded or influenced advocacy organizations addressing obesity, obesity treatment, and GLP-1 RAs, including The Obesity Society, the Obesity Action Coalition, the Obesity Action Network, the American Board of Obesity Medicine, and the Stop Obesity Alliance.

82. These organizations presented pharmaceutical treatment as an important response to obesity and helped shape public and professional opinion. Novo's financial support and relationships were material to the credibility of the resulting messages.

[47] *See* U.S. CENTERS FOR MEDICARE & MEDICAID SERVICES, Novo Nordisk, Inc., OPENPAYMENTSDATA, available at https://openpaymentsdata.cms.gov/company/100000000144 (last visited August 31, 2026); LaMattina, J., *Fattening Doctors To Promote Weight Loss Drugs*, FORBES (July 20, 2023), available at https://www.forbes.com/sites/johnlamattina/2023/07/20/fattening-doctors-to-promote-weight-loss-drugs/ (last visited August 31, 2026); Florko, N., *Novo Nordisk bought prescribers over 450,000 meals and snacks to promote drugs like Ozempic*, STAT (July 5, 2023), available at https://www.statnews.com/2023/07/05/ozempic-rybelsus-novo-nordisk-meals-for-doctors (last visited August 31, 2026).

[48] *See* Terhune, C., & Respaut, R., *Maker of Wegovy, Ozempic showers money on U.S. obesity doctors*, REUTERS (Dec. 1, 2023), available at https://www.reuters.com/investigates/special-report/health-obesity-novonordisk-doctors/.

83. Novo recognized that physician reluctance to prescribe weight-management medication could limit sales. Novo therefore funded and operated educational programming intended to persuade healthcare providers that obesity required pharmaceutical treatment.

84. Novo offered continuing medical education through platforms such as Rethinking Obesity and supported education produced by other organizations. The materials emphasized obesity treatment and GLP-1 RAs without providing fair and complete information about NAION.

85. Novo also influenced research and academic literature concerning obesity, semaglutide, GLP-1 RAs, and the safety and efficacy of weight-management treatment. Novo funded studies, publications, conference presentations, and authors whose work shaped prescribing decisions.

86. Novo lobbied for broader insurance coverage of GLP-1 RAs, including coverage for chronic weight management. Broader coverage reduced cost barriers and increased the number of patients exposed to Wegovy and other Novo products.

**H. Defendants' Branded Advertising and Off-Label Promotion**

87. Novo used television, digital, print, social-media, website, and direct-to-consumer advertising to promote semaglutide products and the weight-management market. Its broader GLP-1 RA marketing portfolio, including Wegovy-specific campaigns, also included the Ozempic television advertisement "Magic," launched July 30, 2018, which repeated "Oh, oh, oh, Ozempic!" and stated that "you may lose weight" and that adults lost on average up to 12 pounds. The campaigns highlighted weight loss and convenience while minimizing or omitting serious risks.[49]

88. Novo's Wegovy advertising and consumer-facing websites emphasized the amount of weight that patients could lose and presented Wegovy as a solution for chronic weight

[49] Ozempic TV Spot, "Oh!", ISPOT (July 30, 2018), available at https://www.ispot.tv/ad/d6Xz/ozempic-oh (last visited August 31, 2026).

management. Those materials did not give comparable prominence to the possibility of serious, permanent vision loss from NAION.

89. Novo's advertisements and statements also used the success of clinical trials to create an impression that the advertised weight loss was typical and durable. The materials did not adequately disclose that many patients are nonresponders or regain weight after treatment ends.

90. Novo's social-media campaigns used hashtags, influencers, sponsored content, and online engagement to make semaglutide products part of popular culture. Such campaigns reached consumers who might not otherwise have discussed prescription weight-management medication with a physician.

91. Novo's digital marketing used audience-targeting tools to direct messages to consumers based on age, interests, online behavior, and perceived receptiveness to weight-loss information. The campaigns could reach vulnerable consumers without the balanced counseling ordinarily provided in a clinical encounter.

92. Although Wegovy was approved for chronic weight management, Novo's broader promotion of semaglutide products blurred the distinctions among Wegovy and other GLP-1 RAs. The combined promotion encouraged demand for semaglutide without a complete presentation of product-specific risks or prescribing limitations.

93. Novo's promotional communications did not fairly balance the advertised benefits of Wegovy with the risk of NAION, the possibility of irreversible optic-nerve injury, or the need for individualized screening and monitoring.

### I. Defendants' Telehealth Partnerships and Access Programs

94. Novo sought to make GLP-1 RAs broadly accessible through telemedicine and other direct-to-consumer services. Online prescribing can reduce the time available for a careful history, examination, risk assessment, and discussion of alternatives.

95. Novo announced a partnership with Noom on October 1, 2019, for "digital health solutions to help people with obesity lose weight and keep it off."[50] Novo has been an investor in Noom since 2021.[51] Noom Med provides consumers with prescriptions for GLP-1 RAs through physicians hired by Noom, and Noom has over 45 million users.[52] These arrangements allowed consumers to seek prescriptions through online services rather than through an established, longitudinal physician relationship.

96. Other telehealth providers, including Weight Watchers and Calibrate, also offered or facilitated access to GLP-1 RA prescriptions. Weight Watchers purchased telehealth startup Sequence for $132 million to provide weight-loss medications to its subscribers, and Weight Watchers had over 3.5 million subscribers.[53] Collectively, telehealth providers directly or

---

[50] NOVO NORDISK, *Novo Nordisk and Noom to partner around digital health solutions to help people with obesity lose weight and keep it off*, PR NEWSWIRE (Oct. 1, 2019), available at https://www.prnewswire.com/in/news-releases/novo-nordisk-and-noom-to-partner-around-digital-health-solutions-to-help-people-with-obesity-lose-weight-and-keep-it-off-811725389.html (last visited August 31, 2026).

[51] *See* Bell, K., *Noom raises $540 million to drive expansion beyond weight-management* FIRSTWORD HEALTHTECH (May 25, 2021) https://firstwordhealthtech.com/story/5308555 (last visited August 31, 2026).

[52] *See* Noom's big number moat: 45 million, EXITS & OUTCOMES (Nov. 15, 2021), available at https://exitsandoutcomes.com/free-excerpt-from-the-noom-report-a-45-million-moat/.

[53] *See* Weintraub, K., *WeightWatchers is adding next-generation weight loss drugs like Wegovy to its program*, USA TODAY (Mar. 9, 2023), available at https://www.usatoday.com/story/news/health/2023/03/07/weightwatchers-sequence-wegovy-obesity-weight-loss-drugs/11415201002/ (last visited August 31, 2026); WW INTERNATIONAL INC., *WW International, Inc. Announces First Quarter 2023 Results* (May 4, 2023), available at https://finance.yahoo.com/news/ww-international-inc-announces-first-200100340.html (last visited August 31, 2026).

indirectly partnered with or promoted by Novo accounted for approximately half of all weight-loss prescriptions in 2022.[54]

97. Novo also used savings cards, coupons, and other discounts to reduce the initial cost of GLP-1 RA prescriptions. When Novo launched Ozempic in the United States, it offered an "Instant Savings Card to reduce co-pays to as low as $25 per prescription fill for up to two years." The program exemplified the broader portfolio strategy, including Wegovy, of encouraging new consumers to begin treatment without adequately informing them about the long-term financial and medical consequences of continued use.[55]

98. The combined effect of advertising, physician influence, telehealth access, and discounts was to increase the number of patients exposed to Wegovy. Novo did not use the same channels to provide an equally prominent warning concerning NAION

**J. Defendants' Failure to Warn**

99. A pharmaceutical manufacturer has a continuing duty to provide an adequate label and to ensure that its warnings remain adequate for as long as the product is marketed. The duty continues after FDA approval when new safety information emerges.

100. FDA regulations require labeling to be revised to include a warning about a clinically significant hazard when there is reasonable evidence of a causal association between a serious hazard and a drug. A definitive causal relationship is not required before a warning is added.[56]

---

[54] *See* Palmer, K., *Where are patients getting their prescriptions for GLP-1 drugs like Wegovy and Ozempic?*, STAT (Aug. 10, 2023), available at https://www.statnews.com/2023/08/10/wegovy-ozempic-weight-loss-telehealth-prescriptions/ (last visited August 31, 2026).

[55] NOVO NORDISK, *Novo Nordisk Launches Ozempic and Fiasp, Expanding Treatment Options for Adults With Diabetes*, PR NEWSWIRE (Feb. 5, 2018), available at https://www.prnewswire.com/news-releases/novo-nordisk-launches-ozempic-and-fiasp-expanding-treatment-options-for-adults-with-diabetes-300592808.html (last visited August 31, 2026).

[56] 21 C.F.R. § 201.57(c)(6)("a causal relationship need not have been definitely established.")

101. FDA guidance further provides that the Warnings and Precautions section should describe clinically significant adverse reactions and other safety hazards that affect prescribing decisions or patient management, including serious risks that may be infrequent or mitigated through appropriate use. The FDA's draft guidance likewise instructs firms to consider how risk information is presented and to evaluate the net impression of promotional communications.[57]

102. FDA's CBE regulation permits a manufacturer to add or strengthen a warning without prior FDA approval when the manufacturer becomes aware of newly acquired information showing that the label may be inadequate. The manufacturer must then submit the required supplemental filing to the FDA.

103. Defendants possessed newly acquired information from adverse-event reports, scientific literature, clinical data, and their own post-market surveillance concerning NAION and semaglutide. Under FDA post-market reporting regulations, Defendants were obligated to investigate adverse events associated with their GLP-1 RAs, including by pursuing additional information regarding serious unexpected adverse drug experiences.[58] Under FDA safety-reporting regulations, Defendants were also required to review information relevant to the safety of their GLP-1 RAs and report it to the FDA.[59] That information supported a warning and triggered the need to evaluate a CBE label change.

104. The FDA has limited resources to monitor the thousands of prescription drugs on the market. Manufacturers have superior access to product-specific adverse-event data, clinical information, and reports from physicians and patients.

---

[57] *See* U.S. FOOD AND DRUG ADMIN., DRAFT GUIDANCE FOR INDUSTRY: PRESENTING RISK INFORMATION IN PRESCRIPTION DRUG AND MEDICAL DEVICE PROMOTION (May 2009), available at https://www.fda.gov/media/76269/download (last visited August 31, 2026).
[58] *See* 21 C.F.R. §§ 310.305, 314.80.
[59] *See* 21 C.F.R. § 312.32.

105. Uncommon risks, risks that resemble common medical conditions, and risks that emerge after approval may not be detected in pre-approval clinical trials. Defendants therefore had a particular obligation to monitor Wegovy after approval and communicate newly recognized risks.

106. The Wegovy label did not warn that semaglutide may cause NAION, did not describe sudden painless vision loss as a potential serious adverse reaction, and did not instruct prescribers to assess relevant optic-nerve risk factors before or during treatment.

107. The Wegovy label also did not provide adequate guidance concerning the risk during dose escalation, including the period after a patient first reaches a higher dose. The absence of such guidance deprived prescribers of information necessary for safe prescribing and monitoring.

108. Defendants did not submit a CBE label update warning of NAION, did not adequately supplement the Warnings and Precautions section, and did not otherwise provide a truthful and complete warning to healthcare providers or patients.

109. Defendants continued to advertise and market Wegovy as an effective and appropriate weight-management treatment while omitting the risk of NAION. Their continued marketing reinforced the inadequacy of the label and increased the likelihood that physicians and patients would choose Wegovy without considering the risk.

110. Plaintiff's prescribing physician, Dr. Emilia Pauline Liao, was a New York endocrinologist and a learned intermediary between Defendants and Plaintiff. Defendants had a duty to provide Dr. Liao with adequate warnings and complete safety information concerning Wegovy.

111. Had Dr. Liao been adequately warned that Wegovy or semaglutide could cause NAION and permanent vision loss, she would have considered the risk, screened Plaintiff for relevant factors, selected a different treatment, used a different dose or titration plan, or advised Plaintiff not to use Wegovy.

112. Defendants' failure to warn Dr. Liao was a substantial factor in Plaintiff's use of Wegovy and in the development of her NAION and its sequelae. The warning omission was a direct and proximate cause of Plaintiff's injuries and damages.

**K. Defendants' Marketing Was Deceptive and Lacked Fair Balance**

113. Defendants' marketing created the overall impression that Wegovy was a safe, effective, and appropriate solution for chronic weight management. That impression was deceptive because Defendants knew or should have known of the risk of NAION and its potentially permanent consequences.

114. Defendants emphasized weight-loss benefits, convenience, chronic-disease messaging, and positive patient outcomes while omitting or minimizing NAION, optic-nerve ischemia, permanent vision loss, and the need for individualized risk assessment.

115. Defendants also failed to disclose that many patients receive little or no meaningful weight loss, that patients commonly discontinue treatment, and that weight is often regained after semaglutide is stopped. Those omissions made the advertised benefits appear more certain and durable than they were.

116. Defendants did not present risk information with content, prominence, readability, duration, or repetition reasonably comparable to the presentation of Wegovy's benefits. FDA guidance evaluates the net impression of promotional materials and requires the content and presentation of important risks to be reasonably similar to the content and presentation of benefits.

Courts have also recognized that DTC advertising "provides the consumer with a diluted variation of risks associated with the drug product."[60] The net impression of the marketing was therefore false and misleading.

117. Defendants' unbranded campaigns, branded advertising, physician education, social-media content, and telehealth partnerships worked together to influence prescribing and patient demand. None of those channels provided a complete and balanced warning concerning NAION.

118. Defendants knew that physicians and patients would rely on their labeling, statements, advertising, and educational materials when deciding whether to use Wegovy. Defendants intended that reliance to increase prescriptions and sales.

119. The omitted information was material to Plaintiff and Dr. Liao because a reasonable physician and patient would consider the possibility of sudden, painless, and permanent vision loss in deciding whether to use Wegovy. Defendants' omissions deprived them of information necessary to make an informed decision.

**L. Plaintiff's Exposure, Injury, and Damages**

120. In or about March 2024, Plaintiff was prescribed Wegovy by Dr. Emilia Pauline Liao, an endocrinologist practicing in New York, New York, for chronic weight management.

121. Plaintiff followed the standard Wegovy titration schedule and reached a dose of 1.0 mg in October 2024. Defendants did not warn Plaintiff or Dr. Liao that NAION could occur during or after dose escalation.

---

[60] *Perez v. Wyeth Lab'ys Inc.*, 161 N.J. 1, 14, 734 A.2d 1245, 1253 (1999).

122. The morning after Plaintiff took her first 1.0 mg dose, she awoke with sudden, painless, partial vision loss in her right eye. The onset was consistent with the serious optic-nerve injury about which Defendants failed to warn.

123. Plaintiff's condition was formally diagnosed as NAION on November 4, 2024. She suffered irreversible ischemic damage to the optic nerve in her right eye and continues to experience NAION and its sequelae.

124. Plaintiff's right-eye vision loss is severe and permanent. She has suffered and will continue to suffer physical injury, medical expenses, impairment, pain and suffering, emotional distress, loss of enjoyment of life, lost earnings, and diminished earning capacity.

125. Plaintiff would not have used Wegovy, or would have used a different treatment or dosing plan, if Defendants and Dr. Liao had been provided with an adequate warning concerning NAION and its sequelae. Defendants' conduct was a substantial factor in causing Plaintiff's injuries.

## V. EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

126. Defendants actively concealed and failed to disclose the association between Wegovy, semaglutide, GLP-1 RAs, and NAION. Defendants concealed the information through inadequate labeling, incomplete physician communications, deceptive marketing, and omission of material safety information.

127. Plaintiff could not reasonably have discovered the concealed risk before her injury because Defendants represented and implied that Wegovy was safe and appropriate for chronic weight management and did not disclose the risk of NAION to Plaintiff or her prescribing physician.

128. Defendants are estopped from relying on any statute of limitations because their active concealment, omissions, and deceptive conduct prevented Plaintiff from discovering the facts necessary to assert her claims. Any applicable limitations period should be tolled until Plaintiff knew or reasonably should have known of the connection between Wegovy and NAION.

## VI. CAUSES OF ACTION

### COUNT I – FAILURE TO WARN – NEGLIGENCE

129. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

130. Under New York law, Defendants owed a duty to exercise reasonable care in the design, manufacture, testing, labeling, marketing, promotion, sale, and distribution of Wegovy, including a duty to provide adequate warnings to prescribing physicians and patients.

131. Defendants knew or should have known that Wegovy and semaglutide were associated with NAION and its sequelae, including sudden, painless, and permanent vision loss. Defendants nevertheless failed to provide an adequate warning in the Wegovy label or related communications.

132. Defendants breached their duty by failing to submit a CBE label update, failing to strengthen the Warnings and Precautions section, failing to notify Dr. Liao of the risk, and failing to provide complete and balanced information concerning NAION and its sequelae.

133. Had Defendants provided an adequate warning, Dr. Liao would have considered the risk, screened Plaintiff, selected another treatment, altered the titration plan, or advised Plaintiff not to use Wegovy. Defendants' omission was a substantial factor in Plaintiff's exposure and injury.

134. As a direct and proximate result of Defendants' negligence, Plaintiff developed NAION and its sequelae, including severe and permanent vision loss in her right eye, and sustained the damages alleged above.

135. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT II – FAILURE TO WARN – STRICT LIABILITY**

136. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

137. Under New York law, a prescription drug may be defective and unreasonably dangerous because its manufacturer failed to provide adequate warnings concerning a known or reasonably knowable risk. Defendants were responsible for the adequacy of Wegovy's warnings when the product left their control and thereafter.

138. Wegovy was defective and unreasonably dangerous because its label and accompanying warnings failed to disclose that semaglutide may cause NAION and its sequelae, including permanent vision loss. The omission made Wegovy less safe than a reasonable physician or patient would expect.

139. Plaintiff used Wegovy in a reasonably foreseeable manner and did not materially alter the product. The defective warning existed when Wegovy was distributed and remained inadequate throughout Plaintiff's use.

140. An adequate warning would have reached Dr. Liao and would have caused her to avoid or modify Plaintiff's Wegovy treatment. The absence of the warning was a substantial factor in causing Plaintiff's NAION and its sequelae.

141. As a direct and proximate result of the defective and unreasonably dangerous product, Plaintiff suffered severe and permanent right-eye vision loss and the economic and non-economic damages alleged above.

142. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT III – BREACH OF EXPRESS WARRANTY / FAILURE TO CONFORM TO REPRESENTATIONS**

143. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

144. Defendants made express representations through the Wegovy label, prescribing information, advertising, websites, sales materials, physician communications, and public statements that Wegovy was safe and effective for chronic weight management and that its material risks were disclosed.

145. The representations were made to induce physicians and patients to prescribe, purchase, and use Wegovy, and they formed part of the basis of Plaintiff's treatment decision. Defendants expected Plaintiff and Dr. Liao to rely on the representations.

146. Wegovy did not conform to Defendants' express representations because it carried a serious risk of NAION and its sequelae that Defendants failed to disclose. The product therefore was not as safe, adequately warned, or suitable as represented.

147. Defendants breached the express warranties when they distributed and promoted Wegovy without the promised disclosure of the risk of NAION. Plaintiff and/or her prescribing physician provided notice of the breach through the injury, medical treatment, and this action.

148. The breach was a substantial factor in Plaintiff's use of Wegovy and in causing her NAION and its sequelae, including permanent vision loss in her right eye. Plaintiff is entitled to recover the resulting damages.

149. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT IV – BREACH OF IMPLIED WARRANTY**

150. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

151.

152. Under New York law, Defendants impliedly warranted that Wegovy was merchantable, reasonably safe, and fit for its ordinary and intended purpose of chronic weight management when used as directed.

153. Wegovy was not merchantable or fit for its intended purpose because it exposed Plaintiff to a serious risk of NAION and its sequelae without an adequate warning. A product that can cause permanent right-eye vision loss without appropriate disclosure is not reasonably safe for its intended use.

154. Defendants knew the particular purpose for which Plaintiff used Wegovy and knew that physicians and patients would rely on Defendants' skill and judgment concerning the product's safety. Plaintiff and Dr. Liao relied on that skill and judgment.

155. Defendants breached the implied warranty by distributing and promoting Wegovy without disclosing the risk of NAION and its sequelae. Plaintiff provided notice of the breach through her injury, medical care, and this action.

156. The breach was a substantial factor in causing Plaintiff to use Wegovy and to develop NAION and its sequelae, including severe and permanent right-eye vision loss. Plaintiff sustained the damages alleged above.

157. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT V – FRAUDULENT CONCEALMENT / FRAUD BY OMISSION**

158. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

159. Defendants possessed superior and exclusive knowledge concerning Wegovy, semaglutide, adverse-event reports, clinical data, and the association with NAION. Defendants also created a duty to disclose by making partial representations about Wegovy's safety and benefits while omitting material risk information.

160. Defendants intentionally or recklessly concealed and omitted that Wegovy and semaglutide could cause NAION and its sequelae, including sudden, painless, and permanent

vision loss. Defendants concealed the information through the label, physician communications, advertising, education, and other promotional materials.

161. Defendants intended that physicians and patients rely on the incomplete information and use Wegovy. Defendants knew that disclosure of the NAION risk could cause physicians to select another treatment or patients to decline Wegovy.

162. Plaintiff and Dr. Liao were unaware of the concealed risk and could not reasonably have discovered it because Defendants' communications represented or implied that Wegovy was safe and appropriate for chronic weight management. Plaintiff and Dr. Liao acted differently than they would have with complete information.

163. Defendants' concealment was a substantial factor in Plaintiff's use of Wegovy and in causing her NAION and its sequelae, including permanent right-eye vision loss. Plaintiff suffered actual, consequential, and punitive damages.

164. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT VI – FRAUDULENT / INTENTIONAL MISREPRESENTATION**

165. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

166. Defendants made material representations and half-truths concerning Wegovy's safety, effectiveness, suitability for chronic weight management, and disclosure of material risks. Defendants communicated those representations through labeling, advertising, websites, physician materials, and public statements.

167. When Defendants made the representations, they knew they were false or misleading, or made them recklessly without regard for their truth. Defendants knew of the NAION safety signal and knew that the omitted information would alter prescribing and use decisions.

168. Defendants intended that Dr. Liao and Plaintiff rely on the representations and use Wegovy. Plaintiff and Dr. Liao reasonably relied on the incomplete and misleading representations in deciding to prescribe and use Wegovy.

169. If Defendants had disclosed the risk of NAION and its sequelae, Dr. Liao would have selected another treatment, modified the dosing plan, or advised Plaintiff not to use Wegovy, and Plaintiff would not have used Wegovy as she did.

170. The misrepresentations and omissions were a substantial factor in causing Plaintiff's NAION and its sequelae, including severe and permanent right-eye vision loss, together with her resulting economic and non-economic damages.

171. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT VII – NEGLIGENT MISREPRESENTATION / MARKETING**

172. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

173. Defendants possessed specialized knowledge concerning semaglutide, Wegovy, GLP-1 RAs, post-market safety, and NAION. Defendants supplied information to physicians and patients for the guidance of those persons in deciding whether to prescribe or use Wegovy.

174. Defendants failed to exercise reasonable care in obtaining, verifying, presenting, and communicating information about Wegovy. Their marketing and communications overstated benefits and omitted NAION and its sequelae.

175. Defendants knew or should have known that physicians and patients would rely on their marketing, labeling, educational materials, and public statements. The reliance was foreseeable because the materials were directed to prescribing and treatment decisions.

176. Dr. Liao and Plaintiff reasonably relied on the incomplete and misleading information. With accurate information, they would have rejected Wegovy, chosen another treatment, or altered the dose and monitoring plan.

177. Defendants' negligent misrepresentation and marketing were a substantial factor in causing Plaintiff's NAION and its sequelae, including permanent right-eye vision loss and the damages alleged above.

178. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT VIII – STRICT PRODUCT LIABILITY MISREPRESENTATION / MARKETING**

179. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

180. Under New York strict-products-liability principles, a product may be defective because its marketing, labeling, or representations fail to disclose material safety information or create a misleading impression about the product's risks and benefits.

181. Defendants' marketing represented or implied that Wegovy was safe and suitable for chronic weight management while omitting the risk of NAION and its sequelae. The marketing lacked fair balance and rendered Wegovy defective and unreasonably dangerous.

182. The defective marketing was directed to physicians and patients and was intended to influence prescribing and use. Plaintiff and Dr. Liao encountered and relied on the product information in making treatment decisions.

183. The defective marketing was a substantial factor in Plaintiff's use of Wegovy and in causing her NAION and its sequelae, including severe and permanent vision loss in her right eye.

184. Plaintiff has suffered medical expenses, physical and emotional injury, pain and suffering, lost earnings, diminished earning capacity, loss of enjoyment of life, and other damages caused by the defective product and marketing.

185. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT IX – NEGLIGENT DESIGN**

186. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

187. Under New York law, Defendants owed a duty to design Wegovy with reasonable regard for patient safety and to select a design whose foreseeable risks did not outweigh its benefits for chronic weight management.

188. Wegovy's design was unreasonably dangerous because semaglutide's pharmacological effects and dose-escalation regimen created a foreseeable risk of NAION and its sequelae, including permanent vision loss, that outweighed the product's benefits for at least some patients.

189. Reasonable alternatives and risk-reduction measures were available, including a different formulation or dose, a different titration or monitoring protocol, contraindications or screening instructions, additional clinical and post-market testing, and an adequate warning. Defendants failed to adopt or evaluate those measures.

190. Defendants knew or should have known of the design risks through pre-market research, clinical trials, adverse-event reports, scientific literature, and post-market surveillance. Defendants nevertheless continued to distribute and promote Wegovy without reasonable safety measures.

191. The negligent design was a substantial factor in Plaintiff's exposure to semaglutide and in causing her NAION and its sequelae, including permanent right-eye vision loss and the damages alleged above.

192. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT X – STRICT LIABILITY DESIGN DEFECT**

193. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

194. Under New York law, a product is defectively designed when it is not reasonably safe for its foreseeable uses, the risks of the design outweigh its benefits, and a safer feasible alternative design or risk-reduction measure was available.

195. Wegovy was defectively designed because its semaglutide formulation and dosing regimen exposed patients to a foreseeable risk of NAION and its sequelae without adequate design safeguards. The product was more dangerous than a reasonable patient or physician would expect.

196. Feasible alternatives and safeguards existed, including a different dose or titration schedule, additional screening and monitoring, design changes that reduced the relevant physiological effects, or a different product for patients at risk. Those measures would have reduced the likelihood or severity of NAION.

197. The defective design existed when Wegovy left Defendants' control, Plaintiff used Wegovy foreseeably, and the product was not materially altered before use. The design defect was a substantial factor in causing Plaintiff's NAION and its sequelae.

198. Plaintiff suffered severe and permanent right-eye vision loss, medical expenses, pain and suffering, emotional distress, lost earnings, diminished earning capacity, and other damages as a result of the defective design.

199. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT XI – NEGLIGENCE**

200. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

201. Under New York law, Defendants owed duties to exercise reasonable care in researching, designing, manufacturing, testing, monitoring, labeling, marketing, promoting, selling, and distributing Wegovy, and in communicating its risks to physicians and patients.

202. Defendants breached those duties by, among other things, failing to conduct adequate pre- and post-market testing; failing to investigate the NAION signal; failing to monitor adverse events; failing to update the Wegovy label; failing to warn; and overpromoting Wegovy while minimizing its risks.

203. Defendants also failed to use reasonable quality-control, safety-monitoring, medical-education, and risk-communication practices, despite their superior knowledge and access to information about semaglutide and GLP-1 RAs.

204. Defendants' conduct violated applicable duties and regulatory safety principles and was a direct and proximate cause of Plaintiff's exposure to Wegovy. The conduct was negligent, reckless, and willful or wanton to the extent shown by discovery.

205. As a direct and proximate result of Defendants' negligence, Plaintiff developed NAION and its sequelae, including sudden and permanent vision loss in her right eye, and sustained the damages alleged above.

206. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

**COUNT XII – NEGLIGENT UNDERTAKING**

207. Plaintiff incorporates by reference paragraphs 1-125 as though fully set forth at length herein.

208. Defendants voluntarily undertook to provide safety information, monitor Wegovy and semaglutide, educate physicians, communicate product risks, update the Wegovy label, and market the product in a truthful and balanced manner.

209. Those undertakings were intended to protect physicians and patients from the risks of Wegovy and to assist them in making informed treatment decisions. Defendants knew that physicians and patients would rely on the information they supplied.

210. Defendants failed to exercise reasonable care in performing the undertakings by omitting the NAION risk, failing to investigate and communicate the safety signal, failing to update the label, and using promotional materials that lacked fair balance.

211. Defendants' failure increased the risk of harm to Plaintiff and caused Dr. Liao and Plaintiff to make treatment decisions without material safety information. With reasonable performance, Plaintiff would not have used Wegovy as she did.

212. The negligent undertaking was a substantial factor in causing Plaintiff's NAION and its sequelae, including severe and permanent right-eye vision loss, and caused the damages alleged above.

213. Plaintiff demands judgment against Defendants for compensatory damages, treble damages where permitted by law, punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and all other relief the Court deems just and proper for her NAION and its sequelae, including permanent right-eye vision loss.

## VII. JURY DEMAND

214. Plaintiff Jane Norton hereby demands a trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jane Norton demands judgment against Defendants for compensatory damages, economic and non-economic damages, punitive damages where permitted by law, attorneys' fees, costs of suit, and such further relief as the Court deems equitable and just.

Dated: September 8, 2026.

Respectfully submitted,

*/s/ Austin P. Smith*

Austin P. Smith
**STECKLER WAYNE & LOVE PLLC**
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
austin@stecklerlaw.com

***Counsel for Plaintiff Jane Norton***